

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No.  39112-4-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOSE AGUSTIN SANCHEZ, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

STAAB, J. — Jose Sanchez appeals his ten convictions for violating a domestic violence no-contact order and two convictions for witness tampering.  The State alleged that Sanchez made numerous calls from jail to a person protected by a pretrial no-contact order during an approximate two-week period.  Sanchez raises five issues on appeal: (1) sufficiency of the evidence to support the convictions, (2) prosecutorial misconduct, (3) whether the crime of witness tampering can be designated as a crime of domestic violence, (4) whether the State's witness provided an improper opinion of guilt, and (5) whether certain fees and assessments should be struck.  The State cross-appeals the trial court's exceptional sentence.

We agree with Sanchez that the evidence was insufficient to support eight of the convictions for violating a no-contact order.  The to-convict jury instructions required the

State to prove that each offense occurred on or about a specific date. While the State admitted ten jail calls, the State failed to introduce any evidence of the dates when eight of the calls were made. Otherwise, we affirm the remaining two counts of violating a no-contact order and two counts of witness tampering. We decline to address the sentencing issues because we remand for resentencing.

## BACKGROUND

*Procedural history*

On May 10, 2021, after Sanchez was charged with domestic violence assault, the superior court imposed a pretrial domestic violence no-contact order protecting the alleged victim, B.T. The State subsequently charged Sanchez with eleven misdemeanor charges of violating a domestic violence no-contact order and two counts of witness tampering. The information alleged that on or about eight specific dates, Sanchez contacted the protected person while the no-contact order was in effect. Prior to trial, the State moved to amend the information to add domestic violence designations to the two counts of witness tampering and to remove one count of violating a domestic violence no-contact order. Sanchez objected, arguing the designation did not apply to charges for witness tampering. The judge overruled the objection and allowed the amendment.

*Trial*

Detective Eugene Davis, who works for the Okanogan County Sheriff's Department, was called as a fact witness at trial. Detective Davis provided brief

testimony relating to his experience as an officer as well as his experience with domestic violence cases. He explained that he had made roughly 80 to 100 domestic violence arrests and had over 200 total investigations. The State asked Detective Davis to describe common characteristics of people who commit domestic violence crimes based on his training and experience. Defense counsel's relevance objection was sustained. The State rephrased the question, asking Detective Davis to describe common characteristics of people who suffer from domestic violence. After the objection for relevancy was overruled, Detective Davis explained that victims are often "non-responsive, not willing to help [ ] law enforcement," and often experiencing the "worst thing in their life at [the] time" they call for help. Rep. of Proc. (RP) at 181-82.

Detective Davis then testified that a no-contact order was issued on May 10, 2021, prohibiting Sanchez from contacting B.T. Detective Davis testified that he listened to Pay Tel and HomeWAV[1] calls from the jail that were made in late August and early September 2021. While initially indicating that he could not recall the number of calls he listened to, Detective Davis eventually testified that he listened to "around" ten calls, including one Pay Tel call and nine HomeWAV calls. He identified Sanchez as the person who placed these calls.

---

[1] Pay Tel Communications is the main telephone system for inmates. HomeWAV, LLC, is a video visitation system similar to Skype. Both types of calls are recorded and tracked.

3

The State asked Detective Davis "how did each of those calls violate the Domestic Violence No Contact Order you talked about?" RP at 199. Defense counsel objected, stating that the question called for a "legal conclusion." RP at 199. The court sustained the objection, requesting the State to either rephrase the question or ask another. The State then asked, "[h]ow did those calls violate the terms of the Domestic Violence No Contact Order that you read to us?" RP at 199. Defense counsel did not object, and Detective Davis went on to answer that Sanchez "had direct contact with [B.T.] by phone and by the video chat system." RP at 199.

At one point, Detective Davis indicated that there was one Pay Tel call he listened to from September 23. Later, he clarified that there was one Pay Tel call from Sanchez to the protected party sometime between August 19 and September 2. Finally, when the prosecutor asked Detective Davis if the Pay Tel call was from August 23, Detective Davis did not correct her.

Detective Davis was then asked about the contents of the Pay Tel call made on August 23 and the HomeWAV call made on August 29. He indicated that during these calls Sanchez was telling B.T. that he (Sanchez) was looking at substantial time if convicted and trying to convince her to change her story and contact his attorney. Otherwise, Detective Davis did not describe any of the other calls. Nor did the State play any of the recorded calls for Detective Davis, or ask him if the calls contained in the State's exhibits were the same calls he identified as made by Sanchez to B.T.

4

The State then called B.T. as a witness. The State informed her that it was "going to ask [ ] a few questions about [her] relationship with Mr. Sanchez prior to the time that [the] alleged crimes occurred . . . [to] allow the jury to get a sense of [her] emotional and financial state at the time that [the] alleged incidents occurred." RP at 213. She explained that she and Sanchez had a ten-year relationship and three kids together. Additionally, B.T. provided background on when they met, when they moved in together, and brief information about their children.

The State then played ten recorded calls, five Pay Tel calls and five HomeWAV calls. B.T. identified the people in each call as herself and Sanchez. The prosecutor identified some of the exhibits by a date, but never asked B.T. when the calls were made or even to confirm the date of the calls.

The State introduced Exhibit 7, described as a Pay Tel call, and played the recorded call in its entirety. Similar to the other exhibits, B.T. identified the voices as herself and Sanchez. B.T. did not indicate when the call was made. However, Sanchez is heard telling B.T. that he is looking at "life or ten years." RP at 231. He then tells her: "On that one thing, you could write something to them guys and help me out on that shit somehow, fucking say something, fucking BS whatever. They're going to try to hold me here on that shit." RP at 231. Later, he tells B.T.,

> I don't know—from nobody—just on the regs—just on there right now, it's in me. The only way to get it gone is by fucking—is to say that—you

know, it's just going to hurt you now (indiscernible). (Indiscernible) I mean, 20 sitting there or life to 20.

RP at 231. As the conversation winds down, B.T. asks, "what's this for," to which Sanchez replies,

It's my lawyer, in case you think about doing that. The sooner the better. If not, they're going to fucking exonerate it or whatever and I'm going to stay here for fucking—until whatever. It would be nice to get out and see my kids and take care of some business and stuff. It's 509—is that good?

RP at 233.

The State introduced Exhibit 8, a HomeWAV video call and played the recording for the jury. The exhibit was not identified by date and B.T. was not asked when the call occurred.

The State introduced Exhibit 11, another HomeWAV video call and played the entire video. During this call, Sanchez and B.T. discussed the fires in Twisp. At some point, the following conversation occurs:

MR. SANCHEZ: And did you ever reach out to that one guy?

MS. THOMAS: No.

MR. SANCHEZ: You ever get him?

MS. THOMAS: I don't know.

MR. SANCHEZ: You don't know? What's that mean?

MS. THOMAS: Yeah, I'm undecided.

MR. SANCHEZ: You're looking to do better right here?

6

MS. THOMAS: No. I'm not—I'm not going to lie about it and like no, I
made it all up; it never happened. Like I don't know—I was thinking
about dropping the charges, but fucking—

RP at 249.

Sanchez testified on his own behalf. He admitted signing the no-contact order but claimed that he did not have sufficient time to read and understand it during the hearing. He also admitted making each of the calls included in the ten exhibits. He did not testify as to when those calls were made. He did testify that he did not realize the no-contact order prevented him from calling B.T. from jail and thought it only prevented physical contact. Moreover, he did not believe he was violating the no-contact order because the jail approved the calls.

*Conclusion of trial*

The jury was provided standard instructions. The court instructed that the "lawyers' remarks, statements, and arguments are intended to help you understand the evidence and apply the law." Additionally, it informed the jury that the evidence presented may be either direct or circumstantial and the law does not distinguish between direct and circumstantial evidence in weight or value in finding the facts of the case. The to-convict jury instructions required the State to prove that each of the 12 counts occurred on or about a specific date. The jury convicted Sanchez on all twelve counts and this appeal followed.

ANALYSIS

Sanchez raises several issues on appeal. Because he challenges the sufficiency of evidence used to support all twelve convictions, we must address this issue first.

1. SUFFICIENCY OF THE EVIDENCE

Sanchez argues the State failed to prove that the alleged crimes occurred on or about the dates alleged in each jury instruction. He contends that when these dates were added to the to-convict jury instructions, the dates became elements that the State was required to prove. While he acknowledges that there was evidence of ten calls made from Sanchez to B.T., he contends there was no evidence of when those calls were made. The State responds that Detective Davis testified Sanchez made about ten calls from jail between August 21 and September 2, and this was sufficient to prove the on or about dates listed in the to-convict jury instructions.

We conclude that the evidence is sufficient to support four charges from two dates. The charges of violating a no-contact order and witness tampering for counts 1 and 5 (both alleging the crimes occurred on or about August 23, 2021) and counts 2 and 7 (both alleging the crimes occurred on or about August 29, 2021). As to the remaining charges, the State failed to introduce sufficient evidence to show that these charges occurred on or about the dates alleged in the information and the corresponding to-convict jury instructions.

"The State has the burden of proving the elements of a crime beyond a reasonable doubt." *State v. Clark*, 190 Wn. App. 736, 755, 361 P.3d 168 (2015). When a defendant challenges the sufficiency of the evidence against him, this court views "the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* A challenge to the sufficiency of the evidence "admits the truth of the State's evidence." *Id.* When challenging sufficiency of the evidence, "circumstantial evidence and direct evidence carry equal weight." *State v. Goodman*, 150 Wn.2d 774, 781, 83 P.3d 410 (2004). The proper remedy where the State does not present sufficient evidence of all the elements of the crime, including added elements, is to reverse the conviction and dismiss with prejudice. *State v. Hickman*, 135 Wn.2d 97, 103, 954 P.2d 900 (1998).

Generally, the date of an offense is not an essential element of the crime. *See State v. Brooks*, 195 Wn.2d 91, 98, 455 P.3d 1151 (2020). For crimes in which the exact date is not an essential element, the State is required to prove only that the crime was committed before the expiration of the statute of limitations. *State v. Stribling*, 164 Wn. App. 867, 879, 267 P.3d 403 (2011). However, when dates are added to a to-convict jury instruction, they become essential elements under the law of the case doctrine and the State must then prove the additional element. *Hickman*, 135 Wn.2d at 102-03. Even as added elements, however, the State need only prove that the crimes occurred around the

time of the alleged date. *See State v. Polk*, 187 Wn. App. 380, 395, 348 P.3d 1255 (2015).

With respect to counts 3, 4, 6, 8, 9, 10, 11, and 12, alleging misdemeanor violation of a domestic violence no-contact order, the State failed to produce evidence that Sanchez violated the no-contact order on or about the dates alleged. Here, the amended information identified each count as occurring on or about a specific date between August 21 and September 2, 2021, and these dates were included in the to-convict jury instructions. At trial, the State introduced evidence that a pre-trial no-contact order was issued on May 10, 2021. The State also introduced ten exhibits of recorded calls between Sanchez and B.T. While the calls were made when Sanchez was in jail, there was no evidence of the dates when Sanchez was actually in jail. The recorded calls did not contain a date reference, and neither Sanchez nor B.T. testified as to when the calls were made.

Detective Davis testified that he listened to or watched ten calls from Sanchez to Davis made between August 19 and September 2. However, other than the calls made on August 23 and August 29, he did not testify as to the content of any of the calls. Nor was he ever asked if any of the ten recorded calls admitted as exhibits were the same calls that he listened to and that took place between August 21 and September 2.

The State asserts that the evidence is nonetheless sufficient for several reasons. First, the State contends that the prosecutor introduced several of the exhibits by

reference to a date, and B.T. did not disagree.  Br. of Resp't at 11-12.  For example, the prosecutor introduced Exhibit 6 by stating, "[o]kay.  [B.T.], I'm going to play the start of a Pay Tel call that was made on August 21st of 2021," and then proceeded to play the recording.  RP at 217.  But B.T. was never asked to confirm the date.  And, as the jury was properly instructed, the prosecutor's statements are not evidence.

The State also argues that Detective Davis' testimony was sufficient as circumstantial evidence that all of the recorded calls occurred in late August and early September.  The State notes that Detective Davis testified there were ten calls in this time period and the State introduced evidence of ten calls.  The State reasons that circumstantial evidence suggests that the ten calls Detective Davis testified about were the same calls contained in the exhibits.  We disagree.  Detective Davis testified that he listened to one Pay Tel call and nine HomeWAV calls.  The State's ten exhibits included five Pay Tel calls and five HomeWAV calls.  Given this disparity, the fact that Detective Davis may have listened to ten calls does not mean he listened to the same ten calls that formed the basis for the ten charges.

While we find the evidence insufficient to support convictions on counts 3, 4, 6, 8, 9, 10, 11, and 12, we find the evidence otherwise sufficient with respect to counts 1, 2, 5, and 7.  Counts 1 and 5 charged witness tampering and violation of a no-contact order on or about August 23, and counts 2 and 7 charged the same crimes occurring on or about August 29.

For these counts, there was circumstantial evidence that Sanchez made phone calls on August 23 and August 29. Detective Davis described the contents of two calls, one Pay Tel call on August 23 and one HomeWAV call on August 29. The State played Exhibit 7, a Pay Tel call from August 23, and Exhibit 8, a HomeWAV call from August 29. The content of these calls matched the descriptions given by Detective Davis. B.T. identified the persons on the calls as herself and Sanchez.

2.   IMPROPER OPINION OF GUILT

Sanchez contends that the State violated his constitutional right to a fair trial when the State asked Detective Davis, "[h]ow did those calls violate the terms of the Domestic Violence No Contact Order that you read to us?" and Detective Davis answered that Sanchez "had direct contact with [B.T.] by phone and by the video chat system." RP at 199. The State responds that Sanchez waived the challenge by failing to object.

*Standard of review and error preservation*

We agree with the State that Sanchez did not preserve this issue at trial. The State asked the same question twice. The first time it asked the question, the court sustained Sanchez's objection. The State immediately asked an almost identical question and Sanchez failed to object.

In Washington, an "'appellate court may refuse to review any claim of error [that] was not raised in the trial court.'" *State v. O'Hara*, 167 Wn.2d 91, 97-98, 217 P.3d 756 (2009) (quoting RAP 2.5(a)). This rule comes from the principle that defense counsel is

12

obligated to seek a remedy as errors occur or shortly thereafter. *Id.* at 98. Requiring preservation through objections "serves the goal of judicial economy by enabling trial courts to correct mistakes and thereby obviate the needless expense of appellate review and further trials." *State v. Lazcano*, 188 Wn. App. 338, 356, 354 P.3d 233 (2015).

Sanchez argues his first objection was sufficient to preserve the issue and cites to *State v. Barrow*, 60 Wn. App. 869, 876-77, 809 P.2d 209 (1991). We find this case distinguishable. In *Barrow*, defense counsel objected to specific comments made in the initial argument and rebuttal arguments, and the court held that it would examine whether there was a substantial likelihood that "those comments" affected the jury's verdict. *Id.* at 877. Here, when the State asked the first question, the court sustained Sanchez's objection before Detective Davis could answer. Unlike *Barrow*, the testimony that Sanchez challenges on appeal was admitted without objection.

Sanchez frames the issue as one in which the trial court erred in allowing the witness to provide an improper opinion of guilt. But it is not the trial court's job to raise the objection. Rather, defense counsel's failure to object to the second question denied the court an opportunity to rule on the alleged error.

We conclude that Sanchez waived the issue by failing to object to the prosecutor's second question. Sanchez does not argue or provide analysis on alternative grounds for review and so we decline to address this issue. *See* RAP 2.5(a).

3.    PROSECUTORIAL MISCONDUCT

Sanchez argues that the State committed prosecutorial misconduct by introducing evidence that appealed to the passions and prejudices of the jury. Specifically, he argues that Detective Davis provided irrelevant and prejudicial testimony about his background in investigating domestic violence and the "characteristics" of people who suffer from domestic violence. In addition, B.T. testified about her emotional and financial state at the time of the alleged crimes.

We disagree that these questions and answers amount to prosecutorial misconduct. Instead, these are evidentiary objections subject to review under an abuse of discretion standard. Since Sanchez does not assign error the trial court's evidentiary ruling we do not decide whether the trial court abused its discretion by allowing the State to introduce the evidence.

To demonstrate non race-based prosecutorial misconduct, the defendant has the burden of establishing: (1) the State acted improperly, and (2) the State's improper act prejudiced the defendant.[2] *State v. Ramos*, 164 Wn. App. 327, 333, 263 P.3d 1268 (2011). Not all evidentiary errors amount to prosecutorial misconduct. Instead, "prosecutorial misconduct is a term of art referring to prejudicial errors committed by the prosecuting attorney that deny the defendant a fair trial." *State v. Fisher*, 165 Wn.2d 727,

---

[2] Race-based prosecutorial misconduct is reviewed under a stricter standard. *State v. Bagby*, 200 Wn.2d 777, 802-03, 522 P.3d 982 (2023).

14

756 n.8, 202 P.3d 937 (2009). Examples of misconduct include arguments that misstate the law or shift the burden of proof to the defendant. *State v. Emery*, 174 Wn.2d 741, 759-60, 278 P.3d 653 (2012). It is also improper for a prosecutor to argue facts not in evidence. *State v. Dhaliwal*, 150 Wn.2d 559, 577, 79 P.3d 432 (2003). In *Ramos*, the court found that it was prosecutorial misconduct to ask a witness if another witness is lying; but it is not misconduct to ask if another witness is mistaken. 164 Wn. App. at 334.

Here, Sanchez contends that eliciting testimony from Detective Davis about his experience investigating domestic violence and the characteristics of domestic violence victims was irrelevant because Detective Davis was not being called as an expert witness. Even if this is true, Sanchez does not meet his burden of demonstrating that the irrelevant evidence rose to the level of denying Sanchez a fair trial. The evidence was not inherently prejudicial. Indeed, had Detective Davis testified as an expert witness, his experience would undoubtedly be relevant and admissible. *See State v. Case*, 13 Wn. App. 2d 657, 678, 466 P.3d 799 (2020).

Sanchez next claims the prosecutor's questions to B.T. about her history and relationship with Sanchez amounted to misconduct. Sanchez argues this signaled to the jury her emotional and financial state were relevant to the jury's consideration and further implied she was vulnerable to Sanchez's "emotional and mental manipulation." Because Sanchez did not object to these questions, he waived his challenge to this testimony

15

unless he can demonstrate the act was flagrant and ill-intentioned. Sanchez makes no

attempt to do so on appeal. Regardless, we note that B.T.'s state of mind was relevant.

to the witness tampering charges.

We reject Sanchez's claim that the testimony elicited by the prosecutor touched on

Sanchez's right to a fair trial and amounted to misconduct.

4. DOMESTIC VIOLENCE DESIGNATION ON CONVICTIONS FOR WITNESS TAMPERING

Sanchez contends that RCW 10.99.020(4) does not include witness tampering as a

domestic violence offense and therefore the trial court erred in designating the two

witness tampering convictions as crimes of domestic violence. The State responds that

RCW 10.99.020(4) is a non-exhaustive list of offenses to which a designation may be

applied and witness tampering is similar to other crimes specifically listed. We agree

with the State and find no error.

Our review of this issue requires us to interpret the statute. Construction of a

statute is a question of law reviewed de novo. *State v. Engel*, 166 Wn.2d 572, 576, 210

P.3d 1007 (2009). When interpreting a statute, a court's "fundamental objective is to

ascertain and give effect to the legislature's intent." *Lenander v. Dep't of Ret. Sys.*, 186

Wn.2d 393, 405, 377 P.3d 199 (2016). Where the language of a statute is clear, the

legislature's intent will be derived from the plain language of the statute. *Engel*, 166

Wn.2d at 578. In order to determine a statute's plain meaning, courts should examine the

"statute in which the provision at issue is found, as well as related statutes or other

16

provisions of the same act in which the provision is found." *Dep't of Ecology v. Campbell & Gwinn*, LLC., 146 Wn.2d 1, 10, 43 P.3d 4 (2002). However, if after this inquiry the plain meaning is susceptible to more than one reasonable meaning, "the statute is ambiguous and it is appropriate to resort to aids to construction, including legislative history." *Id.* at 12.

The domestic violence act allows certain crimes committed against an intimate partner to receive a domestic violence designation. *See* RCW 10.99.020(4)(b). To determine what crimes are eligible for a domestic violence designation, we first look to the domestic violence statute. The relevant portion reads: "'Domestic violence' *includes but is not limited to* any of the following crimes when committed either by (a) one family or household member against another family or household member, or (b) one intimate partner against another intimate partner." *State v. Abdi-Issa*, 199 Wn.2d 163, 170, 504 P.3d 223 (2022). The list of crimes in RCW 10.99.020(4)(b) is nonexclusive. *Id.* at 171.

Nonetheless, Sanchez contends that witness tampering should not be designated as a crime of domestic violence because it is not a crime against a person or property. In *Abdi-Issa*, the court held that although animal cruelty was not an enumerated crime, it was sufficiently similar to the enumerated crimes that designating it as a crime of domestic violence was not error in light of the particular allegations in that case. *Id.* at 171-72.

17

In this case, the witness tampering allegations were similar to the enumerated crimes of coercion and interference with the reporting of domestic violence. *See* RCW 10.99.020(4)(b)(vii), (xxiii). Interference with the reporting of domestic violence requires proof that the defendant prevented or attempted to prevent the victim of domestic violence from calling 911, obtaining medical assistance, or reporting to law enforcement. RCW 9A.36.150. Likewise, coercion requires proof of the use of a threat to compel or induce another to engage in conduct which that person has "a legal right to abstain from, or to abstain from conduct which he or she has a legal right to engage in." RCW 9A.36.070. Here, the State alleged that Sanchez was attempting to convince B.T. to retract her allegations that Sanchez had previously committed acts of domestic violence against her. Under these circumstances, the court did not error in designating the witness tampering charges as crimes of domestic violence.

Sanchez asserts that the legislature intentionally excluded witness tampering from the list of enumerated offenses. Appellant's Amd. Br. at 30. He cites no authority for this contention and the statute does not support the negative inference.

Citing the general definition of a crime victim, Sanchez also argues that B.T. cannot be a victim of witness tampering because she did not sustain any emotional, psychological, or financial injury to her person or property as a result of Sanchez's attempts to get her to retract her allegations of assault. Appellant's Amd. Br. at 31 (quoting RCW 9.94A.030(54)). A similar argument was rejected in *Abdi-Issa*, where the

18

court noted that the Sentencing Reform Act of 1981, ch. 9.94A RCW, also defined a

"victim of domestic violence" as:

> an intimate partner or household member who has been subjected to the
> infliction of physical harm or sexual and psychological abuse by an
> intimate partner or household member as part of a pattern of assaultive,
> coercive, and controlling behaviors directed at achieving compliance from
> or control over that intimate partner or household member. Domestic
> violence includes, but is not limited to, the offenses listed in RCW
> 10.99.020 and ****26.50.010 committed by an intimate partner or
> household member against a victim who is an intimate partner or
> household member.

RCW 9.94A.030(55).

Here, Sanchez was attempting to convince B.T. to comply with his request that she

retract her earlier report of assault on B.T. Whether a defendant attempts to keep a

domestic violence victim from initially reporting the crime or attempts to convince the

victim to retract their allegations after the fact, the conduct could constitute psychological

abuse as part of a pattern of coercive and controlling behavior of the victim of domestic

violence.

5. SENTENCING ISSUES

Sanchez challenges certain legal financial obligations imposed at sentencing. The

State also cross-appealed the trial court's exceptional sentence. Since we reverse several

convictions and remand for further proceedings including resentencing, we decline to

address these issues at this time.

6.    STATEMENT OF ADDITIONAL GROUNDS (SAG)

Sanchez raises six claims in his statement of additional grounds.  We deny his first

and second claim, conclude that three claims of his claims are based on evidence outside

the record on appeal and decline to review the final claim.

*SAG No. 1: Recordings allowed in the jury room*

Sanchez states the court allowed recordings to go back into the jury room in their

entirety.  Decisions on evidentiary issues are "within the sound discretion of the trial

court" and will not be disturbed on appeal absent abuse of discretion.  *State v.*

*Castellanos*, 132 Wn.2d 94, 97, 935 P.2d 1353 (1997).  A judge may take audiotape or

videotape recorded exhibits into deliberations to review them if "the exhibits are found to

bear directly on the charge and are not unduly prejudicial."  *State v. Frazier*, 99 Wn.2d

180, 189, 661 P.2d 126 (1983); *State v. Gregory*, 158 Wn.2d 759, 847-48, 147 P.3d 1201

(2006) (applying same principles provided for audiotapes to videotapes).

At trial, the court explained that all exhibits admitted into evidence, including

audio recordings and videos would be provided in the jury room for further review.  RP

at 356.  Defense counsel did not object to this.  *See* RP at 356-57.  In addition, the calls

related directly to the several no-contact order violations and witness tampering charges

and Sanchez fails to articulate any prejudice from allowing the jury to review them in the

jury room.  This argument fails.

*SAG No. 2: Recordings played in open court*

20

Next, Sanchez states that defense asked for the jury to hear all recordings in open court. The nature of Sanchez's objection on this issue is unclear and we decline to address this claim.

*SAG No. 3: Shackles during proceedings*

Sanchez claims that he was held in shackles the entirety of the case except for the trial. The record is devoid of any indication Sanchez was in shackles other than at sentencing. *See* RP at 438. The only evidence of shackling was at the sentencing hearing where defense asked if Sanchez could "be unshackled so that he can jot down notes if he thinks they're relevant for sentencing purposes." RP at 438. The State did not object, and the court allowed the shackles to be removed. RP at 438. If Sanchez was shackled during trial, this evidence is not in the record. Since this issue raises facts outside the record, it is more properly considered in a personal restraint petition and we decline to address it on direct appeal. *See* RAP 16.4.

*SAG No. 4: Mention of B.T.'s finances*

Sanchez next contends that there is a breach of agreement because defense was asked at recess not to mention B.T.'s finances and the prosecutor did so, making her a victim in court. The record on appeal does not contain discussions of an agreement. Otherwise, the only mention of finances was during the State's direct examination of B.T., which we address above. To the extent this claim relies on evidence outside the

21

record, it should be raised in a personal restraint petition and we decline to address it on direct review. RAP 16.4.

*SAG No. 5: Ineffective assistance of counsel*

Sanchez argues ineffective assistance of counsel because his current counsel failed to call "former legal [counsel] to see about any letters looking to contact [B.T.] or other [witnesses]." It appears he claims a prior attorney sent a letter to his post office box while he was in jail and his mother mentioned he was trying to contact witnesses. We decline to address this issue because it depends on evidence outside the record on direct review and can be raised in a personal restraint petition. RAP 16.4.

*SAG No. 6: Jail staff monitoring HomeWAV calls*

Finally, Sanchez argues that jail staff was required to make sure any person on HomeWAV does not have a no-contact order. Therefore, he claims that by allowing B.T. to be on his HomeWAV, it helped or influenced by allowing him to violate the no-contact order. Because we reverse Sanchez's convictions for violating the no-contact order, he can raise this argument on retrial.

7. CONCLUSION

We conclude that the evidence is insufficient to support the charges of violating a no-contact order in counts 3, 4, 6, 8, 9, 10, 11, and 12. We therefore reverse these convictions with instructions for the court to dismiss the charges with prejudice.

Otherwise, we find no error and affirm the remaining convictions.  We remand for resentencing in light of our decision.

Reversed and remanded.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Staab, J.

WE CONCUR:

_____
Lawrence-Berrey, C.J.

_____
Cooney, J.

23